UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| LOUIS DEGIDIO, INC.,<br>LOUIS DEGIDIO SERVICES, INC.,<br>JAMES DEGIDIO, and<br>MICHAEL DEGIDIO<br><br>                              Plaintiffs,<br><br>v.<br><br>INDUSTRIAL COMBUSTION, LLC, and<br>CLEAVER-BROOKS, INC.,<br><br>                              Defendants. | Civil No. 19-2690 (JRT/ECW)<br><br>**MEMORANDUM OPINION<br>AND ORDER ON PLAINTIFF'S<br>MOTION FOR PRELIMINARY<br>INJUNCTION** |

Trevor R. Walsten and David A. Brandis, **WALSTEN & TE SLAA, P.A.,** 7900 Xerxes Avenue South, Suite 2000, Bloomington, Minnesota 55431, for plaintiffs.

Ann M. Maher, **HUSCH BLACKWELL LLP**, 555 East Wells Street, Suite 1900, Milwaukee, Wisconsin, 53202, for defendants.

Plaintiffs Louis DeGidio, Inc.; Louis DeGidio Services, Inc.; James DeGidio; and Michael DeGidio (collectively, "DeGidio") brought suit against Defendants Industrial Combustion, Inc., and Cleaver-Brooks, Inc., (collectively, "IC") based on IC's termination of a 60-year business relationship between DeGidio and IC. DeGidio brought claims for breach of contract, fraud/misrepresentation, negligent misrepresentation, estoppel, tortious interference, and unjust enrichment. DeGidio claims that because it is a franchisee, it is entitled to the protections of the Minnesota Franchise Act. DeGidio has moved for a Preliminary Injunction, requesting that the Court enjoin IC from terminating the business relationship. The Court will deny the Motion.

## BACKGROUND

DeGidio[1] is a distributor for IC, which manufacturers burners that are used in boilers. (Am. Compl. ("FAC") ¶ 9, Dec. 2, 2019, Docket No. 40.) The parties and their predecessors-in-interest have had a business relationship for approximately 60 years. (*Id.* ¶ 4.) The parties' relationship has been governed by a series of agreements. The most recent written agreement is from 2007. (*Id.*, Ex. B ("2007 Agreement") at 5, Dec. 2, 2019, Docket No. 40-1.)

### I.   THE 2007 AGREEMENT

As relevant to this dispute, the 2007 Agreement contains the following terms:

> Term: "The Term of this Agreement shall be for three years, beginning on the 15th of November, 2007, unless terminated as provided for herein." (2007 Agreement ¶ 2.)
>
> Merger: "This Agreement represents the entire agreement between IC and Louis DeGidio Inc., the Representative, and all previous agreements (if any) are hereby terminated. No change, alteration or amendment of this Agreement shall be valid unless in written form, and executed by both parties." (*Id.* ¶ 18.)
>
> Minimum stock: The Agreement requires DeGidio to maintain "minimum stock at its place of business for efficient sale, service and repair of I.C. products. (*Id.* ¶ 4)

---

[1] Plaintiffs are referred to collectively as DeGidio for the purposes of this Order. However, only Louis DeGidio, Inc., is a signatory to the various agreements with Defendant Industrial Combustion, Inc. (FAC, Ex. B ("2007 Agreement") at 5, Dec. 2, 2019, Docket No. 40-1.)

> Termination: "This Agreement may be terminated or cancelled by either party without cause with sixty-day written notice. The notice must be sent by Certified U.S. Mail by one party to the other, at their currently known address, and shall include the exact date of termination." (*Id.* ¶ 16.)
>
> Training: "I.C. will assist in the training of the sales and service personnel of the Representative. Training shall be limited to the operation and application of I.C. products, or other training, which from time to time, may be deemed as necessary by I.C. and within related phases of the industry." (*Id.* ¶ 5.)

The 2007 Agreement does not use the term franchise and does not reference any franchise fee. IC has not filed any franchise paperwork with the State of Minnesota. (Aff. of David Brandis ¶ 3, Oct. 11, 2019, Docket No. 9.)

## II. PARTIES' CONTINUED RELATIONSHIP POST-2010

Although the 2007 Agreement expired by its own terms in 2010, the parties continued their distribution relationship until 2019. In May 2019, IC reached out to DeGidio to discuss sales targets, and sent DeGidio a sales target letter proposing that DeGidio aim for $100,000 in sales for fiscal year 2020. (Decl. of Kevin Pheney ("Pheney Decl.") ¶¶ 20–21, Nov. 1, 2019, Docket No. 27.) After several attempts to meet in person, the parties eventually met to discuss plans on August 15, 2019. (*Id.* ¶¶ 25-26.) During the meeting DeGidio declined to increase its territory to the entire state of Minnesota but agreed to the proposed sales target. (*Id.* ¶¶ 27–28.) However, by September 3, 2019, DeGidio had not returned the signed sales target letter, despite IC's repeated requests. (*Id.* ¶¶ 30, 32.) That day, IC gave DeGidio 30 days' notice of termination. (*Id.* ¶ 33.)

DeGidio filed its initial Complaint, seeking declaratory judgment and bringing claims for breach of contract, fraud/misrepresentation, negligent misrepresentation, estoppel, tortious interference, and unjust enrichment on October 10, 2019. (Compl. at 13-25, Docket No. 1.) DeGidio filed its Motion for a Preliminary Injunction on October 11, 2019. (Docket No. 6.) On October 17, 2019, IC withdrew its initial September 3, 2019 notice, and instead issued a new 60-day notice of termination, effective that day. (Pheney Decl. ¶ 34.) On December 2, 2019, while this Motion was pending, DeGidio filed an Amended Complaint, adding Cleaver-Brooks, Inc., as a defendant, and adding two additional claims for violations of the Minnesota Franchise Act and for Controlling Person Liability. (FAC at 1, 26–27.) DeGideo is now seeking to enjoin IC from terminating its business relationship with DeGideo while this litigation unfolds.

## DISCUSSION

### I. LEGAL STANDARD

Whether a preliminary injunction should issue turns upon: (1) the probability of the movant succeeding on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury the injunction will inflict on the non-movant; and (4) the public interest. *Dataphase Sys. Inc. v. CL Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). For a preliminary injunction, the "question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the

movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Wright & Miller, Federal Practice and Procedure § 2948 (2d ed. 1995)).

The Minnesota Franchise Act ("MFA"), Minn. Stat. §§ 80C.01–.22 (2018), alters this standard somewhat. Courts presume irreparable harm to the franchisee if there is a violation of the MFA by a franchisor who has failed to register with the State. *See* Minn. Stat. § 80C.14, subd. 1; *see also Upper Midwest Sales Co. v. Ecolab, Inc.*, 577 N.W.2d 236, 241 (Minn. Ct. App. 1998) ("If the [MFA] applies, irreparable injury is presumed). However, this presumption attaches only in cases where the MFA clearly applies. If the status of the franchisee is unclear, then the Court need not make such a presumption. *See Wave Form Sys., Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1062 (D. Minn. 2014) ("If there is a close factual dispute [about the status of an alleged franchisee] which could go either way at a trial on the merits, a court should be reluctant to issue a preliminary injunction." (quoting *Pac. Equip. & Irr., Inc. v. Toro Co.*, 519 N.W.2d 911, 915 (Minn. Ct. App. 1994))).

## II. DEGIDIO IS NOT A FRANCHISE

This Motion turns on the issue of whether DeGidio is a franchise of IC. If DeGidio were a franchise, it would be entitled to a presumption of irreparable harm, and furthermore would be likely to succeed on the merits, given the various protections of the MFA. DeGidio would thus likely be entitled to a preliminary injunction.

### A. Franchise Requirements

5

The MFA defines a franchise as: "(1) A right granted to the franchisee to engage in business using the franchiser's trade name or other commercial symbol, (2) a community of interest in the marketing of goods or services between the franchisee and franchiser, and (3) a franchise fee paid by the franchisee." *Coyne's & Co. v. Enesco, LLC*, 553 F.3d 1128, 1131 (8th Cir. 2009) (quoting *Martin Inv'rs, Inc. v. Vander Bie*, 269 N.W.2d 868, 874 (Minn. 1978)); *see also* Minn. Stat. § 80c.01, subd. 4(a)(1). IC does not dispute that that parts (1) and (2) of the test are met here. (*See* Opp'n to Prelim. Injunction at 1–2, Nov. 1, 2019, Docket No. 24.) The parties dispute part (3), however—whether DeGidio ever paid IC franchise fee.

The MFA defines franchise fee as:

> [A]ny fee or charge that a franchisee . . . is required to pay . . . for the right to enter into a business or to continue a business under a franchise agreement, including, but not limited to, the payment either in lump sum or by installments of an initial capital investment fee, any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges; provided, however, that the following shall not be considered the payment of a franchise fee:
>
> (a) the purchase of goods or agreement to purchase goods at a bona fide wholesale price;
>
> . . .
>
> (e) the purchase, at their fair market value, of supplies or fixtures or agreement to so purchase supplies or fixtures necessary to enter into the business or to continue the business under the franchise agreement …

Minn. Stat. § 80C.01, subd. 9.

6

A party may prove that it is a franchisee by demonstrating either a direct or indirect franchise fee. *See Coyne's & Co. v. Enesco, LLC*, 553 F.3d at 1131. DeGidio did not pay a direct franchise fee. As relevant here, an indirect franchise fee can be collected in at least one of three ways: (1) requiring a party to purchase an unreasonable minimum inventory; (2) mandatory fees for required training; and (3) charging inflated prices for parts. *See, e.g.*, *Day Distrib. Co. v. Nantucket Allserve, Inc.*, No. 07-1132 (PJS/RLE), 2008 WL 2945442, at *5 (D. Minn. July 25, 2008) (collecting cases). However, ordinary business expenses are not considered franchise fees unless they are unreasonable and lack a valid business purpose. *Id.*

### B. Franchise Fee as Unreasonable Minimum Stock

"A minimum purchase requirement can be a franchise fee 'if the distributors were required to purchase amounts or items that they would not purchase otherwise.'" *Coyne's & Co.*, 553 F.3d at 1131 (quoting *Twin Cities Galleries, LLC v. Media Arts Grp., Inc.*, 746 F.3d 598, 601 (8th Cir. 2007). "To so determine, the Court applies an objective test, examining 'whether the [minimum purchase] requirements were unreasonable.'" *Id.* (quoting *Twin Cities Galleries*, 746 F.3d at 601 (alteration in original)). The 2007 Agreement, under the heading "Responsibilities of the Representative," requires that DeGidio "maintain minimum stock at its place of business for efficient sales, service and repair of I.C. products." (2007 Agreement ¶ 4, at 5.)

DeGidio alleges that as a result of this contractual provision, it "maintain[ed] an adequate service and parts organization" and "conduct[ed] its operations in a manner which would promote customer satisfaction and the purchase and ownership of IC's product line."

7

(FAC ¶ 38, 43.) However, neither maintaining adequate organization nor promoting customer satisfaction is an indication that the contractual stock requirement was unreasonable. *See Am. Parts Sys., Inc. v. T & T Auto., Inc.*, 358 N.W.2d 674, 676–77 (Minn. Ct. App. 1984) (finding that contractual provision requiring distributor to "carry a representative supply of [manufacturer's] products and [to] conduct his business in such a manner as to protect the goodwill and image" of the manufacturer was not unreasonable).[2]

Because DeGidio fails to show that IC unreasonably required DeGidio to maintain a minimum stock, it has not demonstrated an indirect franchise fee.

### C. Franchise Fee as Required Training

The MFA specifically notes that training fees may constitute a franchise fee. Minn. Stat. § 80C.01, subd. 9 ("'Franchise fee' means any fee or charge that a franchisee . . . is required to pay . . . including . . . any training fees . . . ."). However, the trainings and the fees must be mandatory. *See, e.g.*, *Day Distrib. Co.*, No. 07-CV-1132 (PJS/RLE), 2008 WL 2945442, at *6 (collecting cases).

The 2007 Agreement does not require DeGidio to attend any training, but it does require that IC provide training to DeGidio when IC deems it necessary. The parties' submissions indicate that while IC expects that its distributors have requisite knowledge to

---

[2] In briefing this Motion, DeGidio raised several arguments in their reply brief that did not appear in DeGidio's Complaint or Motion. Generally, the Court does not entertain arguments made for the first time in a reply brief. *See* Local Rule 7. 1(c)(3)(B) ("A reply memorandum must not raise new grounds for relief or present matters that do not relate to the opposing party's response."); *see also Redking Foods LLC v. Minn Assocs. LP*, No. 13-CV-0002 (PJS/JSM), 2014 WL 754686, at *4–5 (D. Minn. Feb. 26, 2014). However, even if the Court were to consider DeGidio's new arguments, it would find them insufficient. In their Reply, DeGidio alleges that IC's 2019 requests for a sales target constitute an unreasonable stock requirement. This is so, DeGidio asserts, because IC wanted to promote its newer line of products, and that DeGidio preferred to promote IC's older models. DeGidio has not demonstrated that IC's proposed sales target or its preference to promote its newer products included any stocking requirements, much less unreasonable ones.

8

sell their products, it does not require that distributors attend any trainings. IC has offered three training sessions in the past 6 or more years; of these, it appears DeGidio attended one training session in 2016 and paid $350 for each of its three attendees. While DeGidio claims that the cost of the training went beyond ordinary business expenses, DeGidio has not provided any basis for that allegation. DeGidio has also failed to demonstrate that the training sessions were mandatory; indeed, their attendance at the trainings indicates otherwise. DeGidio has not demonstrated an indirect franchise fee through mandatory training.

### D. Franchise Fee as Inflated Prices

"A price mark-up on goods above a bona fide wholesale price may constitute an indirect franchise fee." *Coyne's & Co.*, 553 F.3d at 1132. "The question of whether the mark-up is a bona fide wholesale price or an indirect franchise fee is a fact-specific inquiry." *Id.*

For IC-manufactured products, IC charged DeGidio a bona fide wholesale price. However, for certain third-party components manufactured by a company called FireEye, IC sold the products to DeGidio at its cost from the manufacturer—without adding any markup. (Decl. of Mike Teasdale ¶ 7, Nov. 1, 2019, Docket No. 26.) It appears that IC did not benefit or profit from the third-party component sales. The essence of a franchise fee is the franchisee paying something of value to the franchisor. Here, because IC sold the components at cost, DeGidio has not demonstrated an indirect franchise fee through inflated pricing.

## III. THE TERMS OF THE 2007 AGREEMENT CONTROL

Although 2007 Agreement expired by its terms in 2010, the parties continued their business relationship on similar or identical terms. The parties are likely operating under some form of an implied-in-fact contract. *See Webb Candy, Inc. v. Walmart Stores, Inc.*, No. 09-CV-2056 (PJS/JJK), 2010 WL 2301461, at *8 (D. Minn. June 7, 2010) ("[W]hen parties continue to perform under an expired contract, their conduct can give rise to a new, implied-in-fact contract.")

There is no evidence indicating that the parties considered amending the termination clause of the 2007 Agreement or any ensuing implied-in-fact contract. Absent any amendment, the Court will assume for the purposes of this Motion that the terms of the 2007 Agreement, including the termination clause, remain in force.[3]

## IV. DEGIDIO DOES NOT MEET THE PRELIMINARY INJUNCTION FACTORS

Because DeGidio is likely not a franchisee, it is not entitled to the protections of the MFA. The Court will thus analyze the preliminary injunction factors without the presumptions accorded a franchisee under the MFA. Because probability of success on the merits has been called the most important of the four factors, the Court will consider it first. *Cf., e.g.*, *Arnzen v. Palmer*, 713 F.3d 369, 372 (8th Cir. 2013).

### A. Probability of Success on the Merits

---

[3] The Court will discount any contracts and promises preceding the 2007 Agreement because the 2007 Agreement contains a merger clause and the parties did not present any evidence suggesting that the clause should be disregarded.

10

For the reasons discussed above, DeGidio is unlikely at this point to succeed on its request for declaratory judgment that it is a franchise. Furthermore, because DeGidio is not a franchise, it does not qualify for the protections of the MFA, which requires franchisors to adhere to specific requirements termination when terminating a franchisee. *See* Minn. Stat. § 80C.14, subd. 3.

Without the additional requirements of the MFA, IC must comply only with the terms of the contract. Here, the 2007 Agreement allows for termination without cause with 60-day written notice. IC's initial termination did not meet this requirement, and it is possible that DeGidio may have a claim for damages incurred during that period.[4] However, IC rescinded that termination notice, and instead issued a new termination notice with the 60-day period required by the contract. The termination thus appears to be valid under the terms of the 2007 Agreement. As a result, the Court cannot say that DeGidio is likely to succeed on its breach of contract or other claims.

### B. Threat of Irreparable Harm to DeGidio

Even absent a presumption, DeGidio still makes a case for irreparable harm. DeGidio's claims of reputational harm are anticipatory and speculative. However, DeGidio also alleges that it will go out of business if IC terminates the agreement. Such harm may be irreparable. *See Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) ("[T]he right to continue a business in which William Semmes had

---

[4] While DeGidio may succeed on this issue, the claim would be for harms already incurred and remediable by money damages. Any claim for damages incurred during that period does not carry a threat of irreparable harm and so cannot support a preliminary injunction.

11

engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms; the Semmes want to sell automobiles, not to live on the income from a damages award.") There is the potential for serious loss in this case, and the Court is sympathetic to the potential loss of a three-generation family business. The Court also finds, however, that the potential harms may be compensated by money damages.

### C. Balance Between Harms

IC would suffer only minimal harm if the preliminary injunction were granted. IC asserts it would suffer reputational harm by having to remove RM Cotton as their co-distributor, but this claim is anticipatory and speculative and IC provides no real evidence of harm.

### D. Public Interest

The public interest does not appear to weigh strongly in either direction in this case. *See, e.g.*, *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 975 (D. Minn. 2018) (determining that the public-interest factor was neutral because the case "implicates primarily business interests, not public rights").

On the whole, because DeGidio has not made a clear showing that it is likely to succeed on the merits of its claims and any harms may be compensated with money damages, the Court will not grant a preliminary injunction at this time.

## CONCLUSION

A preliminary injunction is an "extraordinary and drastic remedy", where the moving party carries the burden of persuasion. *Mazurek*, 520 U.S. at 972. DeGidio did

not pay a franchise fee to IC, and therefore is not a franchise and not entitled to the presumptions and protections of the MFA.  Without these protections and presumptions, DeGidio has not shown that it is likely to succeed on the merits of its claims—the most important factor in the preliminary injunction analysis.  DeGidio has not met the very high standard required for a preliminary injunction, and the Court will deny DeGidio's Motion for a Preliminary Injunction.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for a Preliminary Injunction [Docket No. 6] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: December 18, 2019          _____
at Minneapolis, Minnesota.              JOHN R. TUNHEIM
                                                             Chief Judge
                                           United States District Court