UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| LOUIS DEGIDIO, INC., LOUIS DEGIDIO SERVICES, INC., JAMES DEGIDIO, & MICHAEL DEGIDIO,<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>INDUSTRIAL COMBUSTION, INC., & CLEAVER-BROOKS, INC.,<br><br>　　　　　　　　Defendants. | Civil No. 19-2690 (JRT/JFD)<br><br>**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Trevor R. Walsten, David A. Brandis, **WALSTEN & TE SLAA, PA,** 7900 Xerxes Avenue South, Suite 2000, Bloomington, MN 55431, for plaintiffs.

Jacob Harris, Daniel McGarry, **HUSCH BLACKWELL LLP**, 33 East Main Street, Suite 300, Madison, WI 53701, for defendants.

Defendants, Industrial Combustion, Inc. and Cleaver-Brooks, Inc. (collectively "IC"), have moved for summary judgment in this dispute over the termination of a distributorship. Plaintiffs, Louis DeGidio, Inc., and Louis DeGidio Services Inc, (collectively "DeGidio") were local distributors of industrial burners for IC in Minnesota.[1] DeGidio brought this action alleging that IC had improperly terminated the distributorship. The primary disputes in the case are whether the parties had a franchise arrangement and

---

[1] Michael DeGidio and James DeGidio were dismissed as plaintiffs. (Order Granting in Part and Denying in Part Defs.' Partial Mot. Dismiss, at 14, August 12, 2020, Docket No. 87.)

whether IC breached a contract in terminating DeGidio's distributorship. Because the Court finds that IC did not violate the law or commit any wrongful action in terminating DeGidio's distributorship, the Court will grant IC's Motion for Summary Judgment.

## BACKGROUND

### I. FACTUAL BACKGROUND

Louis DeGidio, Inc. and Louis DeGidio Services, Inc. are Minnesota corporations that shared the same shareholders, were governed by the same officers, and were located at the same place of business. (Aff. of Jacob Harris ("Harris Aff."), Ex. B ("DeGidio Dep.") at 27:1–24, June 1, 2021, Docket No. 108-2.) DeGidio operated as a distributor for IC and its predecessors, distributing industrial burners in Minnesota since around 1958. (Second Amended Complaint ("SAC") at ¶ 14, Mar. 10, 2020, Docket No. 61.) As distributors, they purchased burners from IC, sold burners to customers, and installed and repaired the equipment. (*Id.*) In 1996 James DeGidio and his brother Mike DeGidio formed two corporate entities, Louis DeGidio, Inc. and Louis DeGidio Services, Inc and divided the duties between the entities. (*Id.* at ¶ 15.) DeGidio, Inc. took on the role of distributor, purchasing burners from IC and selling them to customers (most of the businesses) while DeGidio Services, Inc. purchased replacement parts and serviced the equipment for customers. (Second Supp. Aff. of James DeGidio ("Second Degidio Aff."), ¶ 12–13, June 22, 2021, Docket No. 110; DeGidio Dep. at 57:25–58:6.)

DeGidio purchased two categories of equipment from IC, IC manufactured burners and replacement parts. DeGidio also purchased third-party manufactured parts called original equipment manufactured parts ("OEM parts") needed to install and repair burners. (Aff. of David Brandis ("Brandis Aff."), Ex. H ("Pheney Dep.") at 167:12–168:5, June 22, 2021, Docket No. 111-9.) The IC-manufactured burners and replacement parts were the majority of the products purchased by DeGidio. (DeGidio Dep. at 57:25–58:6.) IC would acquire OEM parts from manufacturers and resell them to their distributers, such as DeGidio, at retail prices. (Harris Aff., Ex. D ("Mike Teasdale Decl.") at ¶ 4, June 1, 2021, Docket No. 108-4.) IC did **not** require distributors to purchase OEM parts directly from IC but had a price match program where it would match the prices of other OEM part vendors. (*Id.* at ¶¶ 8–10.) DeGidio frequently took advantage of that program, and when IC could not match the price for an OEM part, DeGidio would purchase the part directly from a third-party vendor. (DeGidio Dep. at 60:12–61:21.)

The relationship between DeGidio and IC was governed by a series of agreements, the latest two were signed in 2000 and in 2007. (SAC at ¶¶ 15, 20–21.) The 2000 Agreement executed between DeGidio, Inc. and IC's predecessor in interest granted DeGidio, Inc. a distributorship where DeGidio, Inc. would purchase equipment from IC and was required to service the equipment once installed. (SAC, Ex. A, ("2000 Agreement") at ¶ 5–6, Mar. 10, 2020, Docket No. 61-1.) Although DeGidio Services was not a signatory to the agreement, it purchased the replacement parts from IC and serviced

the equipment. (Second DeGidio Aff. ¶ 24.) DeGidio describes DeGidio Services' arrangement with IC as a separate implied-in-fact contract independent of DeGidio, Inc.'s written 2000 Agreement. (Pls.' Memo. Opp. Summ. J. ("Pls.' Memo."), at 8, June 22, 2021, Docket No. 109.)

The 2000 Agreement also contained a merger clause stating that the agreement was the entire agreement between the parties and superseded any other agreements. (2000 Agreement at ¶ 12.) Additionally, the agreement contained a termination clause that permitted either party to terminate the relationship without cause provided they gave ninety days' written notice. (*Id*. at ¶ 11(a).)

The 2007 Agreement was executed between DeGidio, Inc. and IC. Again, DeGidio Services was not a signatory to the contract. DeGidio, however, states that the IC representative who signed the 2007 Agreement clarified both before and after the signing that the agreement was meant to bind both DeGidio, Inc. and DeGidio Services, Inc. (SAC at ¶ 21.) DeGidio also states that Mike DeGidio signed the 2007 Agreement on behalf of both DeGidio, Inc. and DeGidio Services, Inc. (*Id.*) Nonetheless, the name "DeGidio Services, Inc." does not appear anywhere in the written contract, and DeGidio asserts that DeGidio Services Inc.'s relationship with IC continued independent and unconnected to that agreement. (Second DeGidio Aff.at ¶ 24.)

Twice during the duration of the 2000 Agreement, IC made representations to DeGidio regarding DeGidio's performance and future as a distributor. The first of those

statements was made in 2004 by IC representative, Ken Hanninen. Hanninen shadowed James DeGidio on a customer service call and afterward told James that DeGidio was performing "great" as a distributor, that IC would "never cut" DeGidio, and that IC would be "crazy if it did." (Second DeGidio Aff. at ¶ 30.)

The next representation was made in November 2007. Prior to signing the 2007 Agreement, IC representative John Stupec stated that DeGidio, Inc. and DeGidio Services, Inc. could continue to distribute IC products and replacement parts so long as the parties did not fail to adequately represent IC. (Second DeGidio Aff. at ¶ 31; SAC at ¶ 21.) In the Compliant, DeGidio stated that it agreed to sign the 2007 Agreement based in part upon that statement. (SAC at ¶ 21.)

Like the 2000 Agreement, the 2007 Agreement contained both merger and termination clauses. The termination clause permitted termination without cause upon sixty days' written notice and the merger clause expressly terminated any outstanding agreements between the parties and required any amendments or alterations to be made in writing. (SAC, Ex. B. ("2007 Agreement") at ¶¶ 16, 18, Mar. 10, 2020, Docket No. 61-2.) Unlike the 2000 Agreement, however, the 2007 Agreement was scheduled to expire after three years. (*Id.* at ¶ 2.)

Following the expiration of the 2007 Agreement, IC and DeGidio continued to work together. DeGidio acknowledges that, while the 2007 Agreement contained a termination date, DeGidio "disregarded that clause at all times during the 11 years, 9

months, and 19 days since [DeGidio] signed [it] . . . and IC also disregarded that clause and continued to work with us." (First Supp. Aff. of James DeGidio, at ¶ 30, Oct. 11, 2019, Docket No. 8.) IC likewise acknowledged that the parties continued to perform under the 2007 Agreement after its expiration in 2010. (Harris Aff., Ex. A. ("Pheney Decl.") at ¶ 10, June 1, 2021, Docket No. 108-1.) However, the relationship changed in one way. DeGidio Services subsumed DeGidio, Inc.'s distributor role and DeGidio, Inc. ceased to function. (Second DeGidio Aff. at ¶ 25.) DeGidio did not inform IC of this change or seek its permission and IC continued to send the invoices to DeGidio, Inc. (SAC at ¶ 50; Harris Aff., Ex. C, at 158:4–12, June 1, 2021, Docket No. 108-3.)

The business relationship between IC and DeGidio deteriorated beginning in 2019. In May 2019, IC reached out to DeGidio to discuss sales targets, and sent DeGidio a sales target letter for DeGidio's signature by which DeGidio would agree to aim for $100,000 in sales for fiscal year 2020. (Pheney Decl. at ¶¶ 20–21.) DeGidio did not sign the target letter, and instead replied by requesting a meeting with IC. (*Id.* at ¶ 22.)

The parties met on August 15, 2019. (*Id*. at ¶ 26.) During the meeting, IC floated the idea of DeGidio expanding its operating territory and discussed using a "more efficient" method to set up burners. (*Id*. at ¶ 29.) DeGidio stated that it could not increase its operating territory and that it did not want to change its burner set up process. (*Id*.) Nonetheless, DeGidio and IC agreed on the $100,000 sales target and DeGidio said it would sign the sales target letter. (*Id*. at ¶ 28.)

However, by September 3, 2019, DeGidio had not returned the signed sales target letter, despite IC's repeated requests. (*Id*. at ¶¶ 30–32.) That day, IC gave DeGidio 30 days' notice of termination. (*Id*. at ¶ 33.) DeGidio filed its original complaint on October 10, 2019. (Compl., Oct. 10, 2019, Docket No. 1.) On October 17, 2019, IC withdrew the initial September 3, 2019 termination notice, and issued a new 60-day notice of termination, effective that day. (*Id.* at ¶ 34.)

II.   **PROCEDURAL HISTORY**

DeGidio filed its original complaint in October 2019. (Compl.) The next day DeGidio brought a motion for a preliminary injunction arguing that DeGidio was a franchisee of IC and would suffer irreparable harm without an injunction. (Mot. Prelim. Inj., Oct. 11, 2019, Docket No. 6.) In December 2019, the Court denied the motion, finding that DeGidio had failed to plead facts sufficient to show that it was a franchisee of IC. (Order Denying Pls.' Mot. Prelim. Inj., at 12–13, Dec. 18, 2019, Docket No. 43.) DeGidio then twice amended its complaint, first in December 2019 and again in March 2020. (First Am. Compl., Dec. 2, 2019, Docket No. 40; Second Amended Complaint ("SAC") at ¶ 14, Mar. 10, 2020, Docket No. 61.)

IC moved to dismiss portions of the Second Amended Complaint. (Partial Mot. Dismiss, Mar. 24, 2020, Docket No. 63.) The Court granted the motion in part. (Order Granting in Part and Denying in Part Defs.' Partial Mot. Dismiss ("Order"), at 14, Aug. 12, 2020, Docket No. 87.) The following DeGidio claims remain: (1) DeGidio is a franchisee

of IC and therefore could not be terminated without a showing of good cause; (2) DeGidio Services could only be terminated for good cause under the terms of its implied-in-fact contract with IC; (3) IC is estopped from terminating its manufacture-distributor relationship with DeGidio; (4) IC tortiously interfered with DeGidio's prospective economic advantage; and (5) IC was unjustly enriched through its termination of DeGidio's distributorship.

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on mere allegations or denials but must show, through the presentation of admissible evidence, that specific facts exist creating a genuine issue for trial. *Anderson*, 477 U.S. at 256 (discussing Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the plaintiff's

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

## II. ANALYSIS

### A. Franchisee Claim

DeGidio claims that it is a franchisee of IC and therefore may not be terminated without good cause under the Minnesota Franchise Act ("MFA"). Minn. Stat. § 80C.13, subd. 3(b). The MFA defines a franchise as a business relationship with three characteristics: (1) the franchisee is permitted to engage in business using the franchisor's trade name, logotype, and other defining characteristics; (2) both parties have a community of interest in marketing goods or services; and (3) the franchisee pays a fee to the franchisor. Minn. Stat. § 80C.01, subd 4. The first two requirements are satisfied by DeGidio's business relationship with IC and are not contested by the parties. The issue before the Court is whether DeGidio paid a franchise fee to IC and would thus be entitled to the protections of the MFA.

A franchisee may pay a fee directly or indirectly provided that its nonpayment results in the termination of the business arrangement between the franchisee and franchisor. *Id*; *OT Indus., Inc v. OT-tehdas Oy Santasalo-Sohlberg Ab*, 346 N.W.2d 162, 167 (Minn. 1984). One such indirect method is to make required purchases from the franchisor above wholesale prices. *Coyne's & Co. v. Enesco*, LLC, 553 F.3d 1128, 1132 (8th Cir. 2009). DeGidio insists that IC required it to purchase OEM parts at above wholesale

price. While it is undisputed that IC sold OEM parts above wholesale prices, there is no factual dispute that DeGidio **voluntarily** purchased OEM parts from IC.

DeGidio contends that IC required OEM purchases in two ways: (1) IC pressured DeGidio into making OEM purchases by subliminally indicating that the purchases were in DeGidio's best interest; and (2) IC forced DeGidio to buy OEM parts from IC by matching the OEM prices of other vendors. The first contention fails because there is a difference between a necessary purchase and an encouraged one, and only a necessary purchase can constitute a franchise fee. Minn. Stat. § 80C.01 subd. 9. DeGidio argues that buying OEM parts from IC was required because all of IC's distributors did, thereby creating the impression that doing so was necessary to maintain the business relationship. But DeGidio cannot identify one instance where a distributorship was ended for failure to buy OEM parts from IC. DeGidio's peer-pressure theory does not prove that the purchases were or appeared to be necessary. Instead, the facts only demonstrate a common trade practice among IC's distributors.

DeGidio's price-matching theory underscores why buying OEM parts from IC was common practice among distributors. DeGidio argues that IC's OEM price-matching program was a method to compel distributors to make purchases from IC. That claim is directly controverted by DiGidio's own testimony. IC's price-matching program undoubtedly encouraged distributors to make purchases from IC instead of third-party vendors, but there is no evidence that purchases were required. DeGidio stated that it

-10-

would purchase OEM parts from third-party vendors "[p]retty much all the time" when the price was too low for IC to match. (DeGidio Dep. at 61:3.) The mere fact that IC attempted to induce DeGidio to purchase OEM parts by agreeing to match the prices of other vendors does not make those purchases a requirement. Even if DeGidio chose to purchase OEM parts from IC simply to increase goodwill, its decision would still be voluntary. DeGidio's OEM purchases were not a requirement for it to do business with IC and thus cannot constitute a franchise fee. The Court will grant IC's Motion for Summary Judgment on the claims arising from DeGidio's assertion that it was a franchisee of IC.

### B. Breach of Contract Claim

DeGidio next asserts that DeGidio, Inc. and DeGidio Services had separate agreements with IC and that DeGidio Services' agreement with IC was an implied-in-fact contract that could not be terminated without good cause. The two oral statements DeGidio points to in support of its argument that the contract was not terminable were not made to DeGidio Services, and even if they were, the statements are not sufficient to create a contractual term converting the arrangement to a for-cause termination requirement.

DeGidio, Inc. and IC were the only signatories to the 2007 Agreement. Despite the parties' oral assertions made before and after signing the Agreement that it was applicable to both DeGidio entities, DeGidio asserts that the merger clause contained in the document limits its applicability to the actual signatories. DeGidio claims that IC and

DeGidio Services had an independent implied-in-fact contract, separate from both the 2000 and 2007 Agreements.

If DeGidio Services was bound by the 2007 Agreement along with DeGidio, Inc., DeGidio Services could be bound by a 60-day termination clause like that in the written agreement, otherwise the agreement would be subject to the general rule that an agreement may be terminated by either party for any reason with notice. When performance flows continually from the expiration of an express contract and in a substantially unchanged manner, the performance may give rise to a new implied-in-fact contract with the same terms as the original express contract. *See Bolander v. Bolander*, 703 N.W.2d 529, 542 (Minn. Ct. App. 2005). Both parties agree, and the facts show, that the performance continued unhindered after the expiration of the 2007 Agreement. Nonetheless, the Court need not decide whether DeGidio Services was bound by the 2007 Agreement, because DeGidio's claim fails even if DeGidio Services did have an independent implied-in-fact contract with IC.

In Minnesota, parties may have an implied-in-fact contract absent the existence of an express contract. *High v. Supreme Lodge of World*, 298 N.W. 723, 725 (Minn. 1941). The terms of an implied-in-fact contract are governed by the objective manifestations of the parties, including course of performance and course of dealing. *Id.* The general rule is that a contract with no definite duration is terminable by either party at will upon reasonable notice. *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845,

853 (8th Cir. 2014) (citing *W.K.T. Distrib. Co. v. Sharp Elec. Corp.*, 746 F.2d 1333, 1335 (8th Cir. 1984).

DeGidio claims that two statements made by IC representatives limited IC's ability to terminate IC's arrangement with DeGidio Services. In 2004, IC representative Ken Hanninen said that DeGidio was performing "great" as a distributor, that IC would "never cut" DeGidio's contract, and that IC would be "crazy if it did." (J. DeGidio's Second Aff. at ¶ 30.) DeGidio claims that this statement bound IC to those terms. The second statement was made in November 2007 by IC representative John Stupec, who told DeGidio that DeGidio, Inc and DeGidio Services, Inc. could continue to distribute IC products and replacement parts so long as the parties did not fail to adequately represent IC. (Second DeGidio Aff. at ¶ 31.)

However, there is nothing in the record that indicates that the Hanninen's statement was made to DeGidio Services. Hanninen was speaking with James DeGidio, an officer of both DeGidio, Inc. and DeGidio Services. Additionally, he referred to DeGidio's success as a distributor. At that time, DeGidio, Inc. was performing the distributor end of the business while DeGidio Services was performing the installation and repair end of the business. If the statement was meant to refer to just one DeGidio entity, it was DeGidio Inc., not DeGidio Services.

Furthermore, John Stupec's statement was, according to DeGidio's own complaint, made to induce DeGidio to sign the 2007 Agreement and in reference to that Agreement

alone. (SAC ¶ 21.) The 2007 Agreement was executed between DeGidio, Inc. and IC, not DeGidio Services. It thus cannot follow logically that Stupec's statement was made about DeGidio Services' independent implied-in-fact contract with IC. Both Hanninen's and Stupec's statements were made concerning DeGidio, Inc., not DeGidio Services. The statements cannot have created any clause in the alleged implied-in-fact contract between DeGidio Services and IC.

Nothing in the record supports the creation of a non-termination clause in a DeGidio Services implied-in-fact contract with IC, even if such a contract did exist. Applying the general rule of contracts, the Court finds that even assuming an implied-in-fact contract, it was terminable upon reasonable notice to the non-terminating party. *Twiestmeyer*, 742 F.3d at 853. IC did not violate its arrangement with DeGidio Services when it terminated DeGidio's distributorship.

Furthermore, even if the statements at issue were made in relation to the alleged implied-in-fact contract, the statements would not constitute binding terms of that agreement. Not all statements regarding future retention of a contract are sufficient to create a contractual term. *Cederstrand v. Lutheran Bhd.*, 263 Minn. 520, 530 (Minn. 1962). In *Cederstrand*, an employee stated "there would be no dismissals as long as people showed willingness to work[,]" but the court found that such a statement did not have any indicia of intent to contract because there was no tone of bargaining or negotiating. *Id.* at 522, 534. The same is true of the statements made by IC's agents.

-14-

Both statements appear encouraging in nature and do not have indicia of bargaining or negotiation nor were they supported by further consideration. Even if DeGidio Services is not bound by the terms of the 2007 Agreement and an implied-in-fact contract were presumed, that agreement would not be altered by the statements at issue. Thus, the implied-in-fact agreement is terminable at will upon reasonable notice and the breach of contract claim must be dismissed.

### C.  Promissory Estoppel Claim

IC's statement that DeGidio "could continue to distribute IC products and replacement parts in the future, and DeGidio would not be terminated except for a failure to adequately represent IC" was not an enforceable promise. The context within which that statement was made supports the conclusion that DeGidio could not reasonably rely upon it as an assurance of a non-terminable distributorship.

The elements of promissory estoppel are: (1) a clear and definite promise; (2) the promisor intended to induce reliance and the promisee so relied; and (3) the promise must be enforced to prevent injustice. *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 746 (Minn. 2000). The promisee's reliance must be reasonable such that the promisee was not aware of the possibility that the promise would not occur and relied only to a reasonable degree. *Meriweather Minn. Land & Timber, LLC v. State*, 818 N.W.2d 557, 567 (Minn. Ct. App 2012).

DeGidio argues it detrimentally relied upon a promise made by an IC representative in 2007 that "DeGidio's future with IC [was] good." (SAC ¶ 86). However, the Court has already dismissed a promissory estoppel claim based on the vagueness of that statement. (Order at 12–13.) DeGidio cannot rely upon that statement to support its promissory estoppel claim.

The Court did not dismiss the promissory estoppel claim based on a second statement made by IC. In 2007, John Stupec said DeGidio "could continue to distribute IC products and replacement parts in the future, and DeGidio would not be terminated except for a failure to adequately represent IC." (SAC ¶ 85). The Court found this statement could survive the motion to dismiss. (*Id.* at 13.) On summary judgment, however, the Court cannot come to the same conclusion. The statement was made to induce DeGidio to sign the 2007 Agreement, which contained a merger clause terminating all prior agreements. Therefore, any reliance by DeGidio on this statement after entering into the 2007 Agreement would not be reasonable.

Nonetheless, DeGidio claims that the 2007 Agreement has no effect here because the Agreement did not include DeGidio Services, Inc. Therefore, DeGidio argues, the merger clause would only terminate promises made to DeGidio, Inc., and not to DeGidio Services. However, DeGidio does not provide support for its contention that IC made the 2007 statement to DeGidio Services rather than to DeGidio, Inc. Further, DeGidio itself admits that the statement induced it to sign the 2007 Agreement, so it follows that

because DeGidio, Inc. and not DeGidio Services signed the 2007 Agreement, the statement must have been made to DeGidio, Inc.

Any promise made by an IC representative to DeGidio terminated with the signing of the 2007 Agreement. Therefore, the Court will grant the Defendants' Motion for Summary Judgement on the promissory estoppel claim.

### D. Tortious Interference Claim

There is no support for DeGidio's tortious interference claims. DeGidio alleged both tortious interference with prospective economic advantage and contract. DeGidio now makes no argument in support of its claim for tortious interference with contract.

Tortious interference with prospective economic advantage requires: (1) the plaintiff has a reasonable expectation of economic advantage; (2) the defendant is aware of that expectation; (3) the defendant intentionally interferes with the prospective advantage either by tort or in violation of federal or state law; (4) in the absence of that wrongful act it is reasonably probable that the plaintiff would have realized the advantage; and (5) the plaintiff sustained damages. *Gieseke v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). Additionally, it is required that the plaintiff specifically identify at least one third party with whom it had a reasonable expectation of a prospective economic gain. *Id.* at 221.

The Court is not convinced by DeGidio's contention that IC wrongfully terminated DeGidio's distributorship because it acted for personal rather than economic reasons.

The record shows that IC believed that the professional relationship with DeGidio had collapsed, not a personal relationship. It determined that the parties disagreed on fundamental marketing strategies and had a poor business rapport. Therefore, there was no tortious or wrongful act, and DeGidio's claim of tortious interference with prospective economic advantage fails.

**E.   DeGidio states its business model relied on long standing relationships that could be leveraged into high-profit sales. Moreover, DeGidio asserts it expected to make numerous sales in the second half of 2019, and informed IC of those expectations, but was unable to reap its economic advantage due to its termination as a distributor. However, DeGidio failed to identify any third party to whom it expected to make those sales. Further, the record shows that DeGidio made no sales in the entire first half of 2019, so IC had no reason to know DeGidio had any specific economic expectation. DeGidio has failed to identify a third party with whom it had a reasonable expectation of economic gain and thus the claim of tortious interference with prospective economic advantage fails. Unjust Enrichment Claim**

Finally, the Court finds no support for DeGidio's claim that IC was unjustly enriched. A showing of unjust enrichment requires that (1) a benefit was conferred on the defendant; (2) the defendant knowingly accepted the benefit and (3) the defendant's

retention of the benefit would be inequitable given the circumstance. *Schumacher v. Shumacher,* 627 N.W.2d 725, 729 (Minn. 2001). Additionally, it is required that the action by which the defendant obtained the benefit must be illegal, unlawful, or immoral. *Id.*

DeGidio's claim that IC unjustly enriched itself rests entirely on the premise that IC wrongfully terminated DeGidio's distributorship. Given that the Court has found that IC did not wrongfully terminate the distributorship, the unjust enrichment claim must be dismissed.

**CONCLUSION**

Viewing the facts in a light most favorable to DeGidio, the Court finds no genuine issues of material fact that must be resolved by a jury. DeGidio has failed to show that IC was not entitled to terminate DeGidio's distributorship. DeGidio did not pay a franchise fee and so cannot be considered a franchisee of IC. Nor was there any contractual provision limiting IC's right to terminate the distributorship with proper notice. DeGidio did not reasonably rely on the assurances of IC. Nor did IC tortiously interfere with DeGidio's prospective for economic advantage. Finally, IC committed no illegal or wrongful act and so was not unjustly enriched through the termination of DeGidio's distributorship. Therefore, the Court will grant IC's Motion for Summary Judgment on all claims.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 105] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

DATED:  December 28, 2022
at Minneapolis, Minnesota.

                                          JOHN R. TUNHEIM
                                             Chief Judge
                                  United States District Court